[Cite as *State v. Mayle*, 2018-Ohio-2511.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J.<br>Hon. William B. Hoffman, J. |
| -vs- | Case No. 2017CA00125 |
| TIMMY LEE MAYLE | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of
                              Common Pleas, Case No. 2016 CR 1005


JUDGMENT:                     Affirmed


DATE OF JUDGMENT ENTRY:       June 25, 2018


APPEARANCES:


For Plaintiff-Appellee                For Defendant-Appellant

JOHN D. FERRERO,                      GEORGE URBAN
Prosecuting Attorney,                 116 Cleveland Ave NW., Suite 808
Stark County, Ohio                    Canton, Ohio 44702

By: KRISTINE W. BEARD
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio 47702-1413

*Hoffman, J.*

**{¶1}** Defendant-appellant Timmy Lee Mayle appeals his conviction and sentence entered by the Stark County Court of Common Pleas, on one count of murder, in violation of R.C. 2903.02(A)(1); and one count of endangering children, in violation of R.C. 2919.22(B)(1) and (E)(2)(d), following a jury trial  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE CASE AND FACTS

**{¶2}** On July 11, 2016, the Stark County Grand Jury indicted Appellant on the aforementioned charges, arising from the death of the twelve month old child of Kayle Yoho while the child was in Appellant's care.  Appellant appeared for arraignment on July 15, 2016, and entered a plea of not guilty to the Indictment.

**{¶3}** The matter proceeded to jury trial on July 19, 2017.  The following evidence was presented at trial.

**{¶4}** Kayle Yoho and Appellant lived together at 1134 7th Street, NW, Canton, Stark County, Ohio, with Yoho's twelve month old child.  Appellant was not the father of the child.  Yoho worked two jobs, leaving for work at 8:30 a.m., and sometimes not returning until after the child's bedtime.  Appellant became the child's primary caregiver.

**{¶5}** On March 11, 2016, Yoho left for work at approximately 8:50 a.m.  Appellant and the child were still asleep.  At approximately 10:00 a.m., Appellant woke up, showered, and checked on the child, who had an extremely dirty diaper.  Appellant called Yoho about a half an hour later, inquiring when she would be home.  Yoho informed him she would be home in about an hour and a half.  Appellant finally removed the child from her pack-n-play, proceeded downstairs, and placed the child on the dining room floor.

Within minutes of calling Yoho, Appellant ran outside, trying to find help for the child, who was limp and unresponsive. Appellant flagged down a truck driver who allowed Appellant to use his cell phone to call 911.

{¶6} Paramedics responded to the call at approximately 10:37 a.m. When they arrived, they found the child unconscious with irregular breathing. Appellant initially told paramedics he did not know what happened to the child. Paramedics placed the child in the ambulance and proceeded to ventilate her with a bag valve mask and give her oxygen. They continued to ask Appellant what happened to the child, and he continued to say he did not know. After one paramedic told Appellant to stop "dicking around", he responded the child might have fallen down two steps. Paramedics, frustrated with Appellant's lack of candor, closed the door to the ambulance and transported the child to Mercy Medical Center. The child was later transferred to Akron Children's Hospital, where she was declared brain dead. Yoho decided to remove the child from life support. The child died on March 12, 2016.

{¶7} Canton Police Officer Richard Hart testified he and his partner, David Wolgamott, were dispatched to 1134 7th St., NW, in Canton, to assist the fire department with a medical emergency. Upon their arrival, the officers spoke with paramedics and were informed they were treating an unresponsive child. The officers learned Appellant was the child's caretaker and made contact with him. Appellant told the officers when the child awoke that morning everything seemed to be fine. Appellant placed the child on the floor in the dining room and left to take the dogs outside. Appellant then heard a thud. When he went inside, he found the child unresponsive. Appellant identified Yoho as the child's mother and advised the officers she was at work. At one point during their

conversation, Appellant told Officer Hart a day or two prior to the incident he (Appellant) had informed Yoho he no longer wanted to watch the child as it was too much for him. On May 12, 2016, detectives learned the child would not survive and Appellant became a suspect.

{¶8} Detective Joseph Mongold of the Canton Police Department initially responded to Mercy Medical Center and spoke with paramedics, emergency room nurses, and Yoho. After the child was transported to Akron Children's Hospital, he responded to the scene and assisted with the consent search of the residence. Det. Mongold returned to the police department and contacted Dr. Raizman, a board certified child abuse expert at Akron Children's Hospital. Det. Mongold learned the child had skull fractures and her injuries were not consistent with the kinds of injuries from a fall or an accident. At that point, Det. Mongold's view of Appellant "began to evolve." Tr. Vol. V at 23. He ultimately developed Appellant as a suspect.

{¶9} Det. Mongold interviewed Appellant on March 17, 2016. By that time, Det. Mongold had learned the child's injuries were not the result of an accident or a fall down the stairs, but "were in fact a result, a direct result of abuse that occurred at the time of the incident." *Id.* at 31. Appellant told Det. Mongold he knew the child's father, David Tucke, and added Tucke and Yoho had a bad relationship. Appellant informed the detective Yoho's relationship with Tucke ended on September 4, 2015, and he (Appellant) and Yoho began their relationship on September 5, 2015. During the interview, Appellant stated Tucke had last seen the child in October, 2015, then subsequently indicated Tucke had last seen the child three months prior to the incident.

{¶10} Appellant told Det. Mongold Yoho started working two jobs three or four months prior to the incident. Appellant advised the detective the child was in good health the week before her death. Appellant noted the child was unable to go up the stairs. When he woke up on the morning of March 11, 2016, Appellant found the child's diaper "full of piss and shit", which was running down her legs. He proceeded to shower and then picked up the child. Holding the child away from him, Appellant went downstairs and placed her on the dining room floor. Appellant left the room and let the dogs outside through the back door. Appellant heard three "hits", returned to the dining room, and found the child unresponsive.

{¶11} Appellant repeatedly told Det. Mongold the child was fine and had no problems when she woke up on the morning of March 11, 2016. Det. Mongold testified the events as described by Appellant did not match the medical evidence and the conclusions reached by the medical examiner.

{¶12} Dr. Michael Rubin, chairperson of the pediatric radiology department at Akron Children's Hospital, reviewed the child's CT scans. Dr. Rubin testified the scans revealed numerous injuries to the child's body in various stages of healing. The injuries included bone fractures to her left forearm, lower left leg, and lower right leg; a skull fracture; and a spine compression fracture. Dr. Rubin noted, while these injuries were indicative of child abuse, those injuries did not cause or contribute to the child's death. Dr. Rubin observed a diffuse swelling of the child's brain, indicating a deprivation of oxygen and an insufficient blood supply. Dr. Rubin explained such a brain injury could be caused by drowning; strangulation; involvement in a high speed motor vehicle accident; non-accidental trauma, for example, child abuse; or severe infections like

meningitis. He noted a severe brain injury, as the child had, does not result from a fall down stairs or a fall off of a bed. Dr. Rubin added, although a skull fracture can occur from a fall down stairs, it is unusual. He concluded the child's injury was the result of severe trauma, and based upon the soft tissue swelling, edema, and hematoma, the injury occurred recently.

{¶13} Dr. George Sterbenz, Chief Deputy Medical Examiner at the Summit County Medical Examiner's Office, performed the autopsy of the child. Dr. Sterbenz noted the report from Mercy Medical Center revealed the child arrived at the hospital in a severe coma with a Glasgow Coma Score of 3, which is the lowest score, and was in respiratory distress, requiring intubation. A CT scan of the child's head revealed an occipital skull fracture, a fracture at the back of the head. A second CT scan was performed at Akron Children's Hospital, which confirmed the presence of the occipital skull fracture as well as bleeding inside the cranial cavity and abnormal traumatic swelling of the brain, which caused her skull bones to push apart. Clinicians at Akron Children's Hospital also noted facial bruising on the child's chin and left eyelid. A skeletal survey performed at Akron Children's Hospital revealed a spine compression fracture and fracture of the left shin bone, left arm bone, right shin bone, and right foreleg.

{¶14} After examination of the child's head, scalp, and skull, Dr. Sterbenz determined the child had been subjected to more than a dozen blunt impact injuries to the front and back of her head. The pattern of bleeding in the skin of the scalp and over the galeal, the membrane covering the skull, indicated these impacts were repeated over a short period of time in the same location. The child also had a fracture from her lambdoidal suture, the connective tissue joint at the back of the skull, to the foramen

magnum, the opening where the spinal cord emerges from the cranial cavity, which caused the skull to become unstable. The fracture also seriously affected the area where the skull and brain stem meet, which is the area responsible for regulating the heart and breathing. Dr. Sterbenz noted the skull fracture and bruises to the child's scalp and galeal were reflective of severe blows to the head.

{¶15} Dr. Sterbenz explained these blows caused concussive forces, shock waves, to travel through the child's brain and skull, resulting in irrevocable stretching, tearing, and killing of brain cells. The skull fracture alone was potentially fatal. The concussive waves also caused excessive swelling of the brain, hemorrhaging in the optic nerve and eyes, and the separation of her brain from her skull. These injuries were recent, "meaning they occurred within minutes of her presenting fatal event." Tr. Vol. IV at 134. Dr. Sterbenz concluded the child died from a concussive brain injury with traumatic encephalopathy due to craniocerebral blunt force trauma. He opined the pattern of injuries was not consistent with a tumbling fall down the stairs. Dr. Sterbenz testified, in his experience, the injuries were consistent with a small child being held by another, who then, in a short period of time and at the same physical location, repeatedly smashed her head against a hard object, such as a piece of furniture or the floor.

{¶16} Dr. Sterbenz utilized a PowerPoint presentation during his testimony, which included photographs from the death scene, autopsy photographs, clipart, and other graphics. Prior to trial, the trial court conducted a hearing with counsel to review the autopsy report and the PowerPoint presentation. Appellant objected to the admission of all of the clipart used in the PowerPoint. The trial court agreed three of the graphics were unnecessary and instructed the state to remove or revise the graphics from the specific

slides. The trial court overruled Appellant's other objections relative to the clipart and graphics, finding the probative value was not substantially outweighed by any prejudicial effect. The trial court also overruled Appellant's objections to a number of autopsy photographs, finding any prejudice caused by such did not outweigh their probative value, as well as his objections to medical illustrations, finding the drawings were not inflammatory. Appellant further objected to five slides as each included photographs previously presented in the PowerPoint. The trial court overruled the objections, finding the duplicative photographs were not overly prejudicial because such were being offered for different purposes and to highlight areas different from the areas highlighted on the photographs as previously presented.

{¶17} At the close of the state's case, Appellant made a Crim. R. 29 motion for acquittal, which the trial court denied. Appellant also renewed his objections to the admission of Dr. Sterbenz's PowerPoint presentation as well as the autopsy photographs therein. The trial court again overruled Appellant's objections with the exception of slide 16, which the state withdrew from evidence.

{¶18} After hearing all the evidence and deliberating, the jury found Appellant guilty as charged. The trial court merged the child endangering count with the murder count for purposes of sentencing. The trial court sentenced Appellant to a term of incarceration of fifteen years to life.

{¶19} It is from these convictions and sentence Appellant appeals, raising the following assignments of error:

I. APPELLANT'S CONVICTIONS WERE AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S OBJECTIONS TO THE ADMISSION OF SEVERAL STATE'S EXHIBITS.

I

{¶20} In his first assignment of error, Appellant challenges his convictions as against the sufficiency and manifest weight of the evidence.

{¶21} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶22} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, supra at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

**{¶23}** "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraph one of the syllabus. The trier of fact is in the best position to judge the credibility of the witnesses.

**{¶24}** Appellant submits, when reviewing the evidence and considering the credibility of the witnesses, one can only conclude the jury clearly lost its way. Appellant contends the multiple injuries the child suffered prior to her death create reasonable doubt as to whether her death was caused by Appellant or was the result of an accidental fall. Appellant adds his consistent story and cooperative behavior throughout the course of the investigation lend credence to his version of the events of March 11, 2016, and were not indicative of someone who had just seriously injured a child.

**{¶25}** Appellant was convicted of endangering children, in violation of R.C. 2919.22(B)(1) and (E)(2)(d), which provides:

> (B) No person shall do any of the following to a child under eighteen
> years of age or a mentally or physically handicapped child under twenty-
> one years of age:
> (1) Abuse the child;
> * * *

(E)(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:

* * *

(d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

**{¶26}** Appellant was also convicted of murder, in violation of R.C. 2903.02(B), which reads:

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

**{¶27}** Under R.C. 2903.02(B), "purpose to kill is not an element of the crime and need not be proven." *State v. Maynard,* 10th Dist. Franklin No. 11AP–697, 2012–Ohio–2946, ¶ 17. "Instead, the mens rea for felony murder is the intent required to commit the underlying predicate offense." *Id.* "Thus, the mens rea element for felony murder under R.C. 2903.02(B) is satisfied when the state proves the intent required for the underlying felony." *Id.* at ¶ 23. Child endangering, in violation of R.C. 2919.22(B)(1), is a felony of the second degree under R.C. 2919.22(E)(2)(d), and is defined as an "offense of violence"

under R.C. 2901.01(A)(9); therefore, may serve as a predicate offense for felony murder. *State v. Blanda,* 12th Dist. Butler No. CA2010–03–050, 2011–Ohio–411, ¶ 17.

**{¶28}** The requisite mens rea for endangering children is recklessness. *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980), paragraph one of the syllabus. "Recklessness" is defined as a person who "with heedless indifference to the consequences, * * * disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

**{¶29}** Upon review of the evidence as set forth in the Statement of the Case and Facts, supra, and all the testimony presented at trial, we find Appellant's convictions were not against the manifest weight and sufficiency of the evidence. The evidence presented refuted Appellant's claims the child fell down the stairs. The child died as the result of injuries she sustained from more than a dozen blows to her head which were repeated over a short period of time in the same location and which occurred shortly before paramedics arrived. Appellant was the only individual with the child during this time.

**{¶30}** Appellant's first assignment of error is overruled.

II

**{¶31}** In his second assignment of error, Appellant contends the trial court erred in overruling his objections to the admissions of a number of the state's exhibits. Specifically, Appellant takes issue with the trial court's admission of the autopsy photographs as well as the medical examiner's PowerPoint presentation as a whole.[1]

---

[1] The state contends, because Appellant did not object to the medical examiner's testimony, the submission of a paper copy of the PowerPoint presentation, or the admission of Exhibit 47, medical illustrations showing the difference between a spiral

A. Standard of Review

**{¶32}** The admission or exclusion of relevant evidence is a matter left to the sound discretion of the trial court. Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *State v. Sage* (1987), 31 Ohio St.3d 173, 180.    In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983)

**{¶33}** Evid.R. 403, which permits the exclusion of relevant evidence on the grounds of prejudice, confusion, and undue delay, reads:

**{¶34}** (A) **Exclusion mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

**{¶35}** (B) **Exclusion discretionary.** Although relevant, evidence *may* be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence. (Emphasis added).

B. Autopsy Photographs

---

fracture and a clean fracture, Appellant has waived all but plain error on review.  We note Appellant objected to the PowerPoint presentation during a final pretrial hearing.  However, at trial, Appellant failed to object to Dr. Sternbenz's testimony, either in manner or substance, and failed to object to any aspect of the PowerPoint presentation. Appellant did object to the admission of the PowerPoint presentation as well as specific slides and photographs at the close of the case.  As we find, infra, Appellant is unable to meet the lesser standard of abuse of discretion, we need not analyze this assignment of error under the higher plain error standard.

**{¶36}** Appellant maintains the probative value of the autopsy photographs was outweighed by the danger of unfair prejudice. Appellant explains, "Seeing the autopsied body of a small child is, in itself, inflammatory. Seeing repetitive photographs negates the probative value and serves only to prejudice the jury." Brief of Appellant at 11.

**{¶37}** "When considering the admissibility of photographic evidence under Evid.R. 403, the question is whether the probative value of the photographic evidence is substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Morales,* 32 Ohio St.3d 252, 257, 513 N.E.2d 267 (1987). "When balancing the probative value against the danger of unfair prejudice, the trial court is vested with broad discretion and an appellate court should not interfere absent a clear abuse of discretion." *State v. Harcourt,* 46 Ohio App.3d 52, 55, 546 N.E.2d 214 (12th Dist.1988), citing *Morales* at 258, 513 N.E.2d 267.

**{¶38}** "[T]he mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible." *State v. Maurer*, 15 Ohio St.3d 239, 264, 473 N.E.2d 768 (1984). "Autopsy photographs are generally admissible to help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake. " *State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 22 (Citation omitted). Likewise, a trial court may admit gruesome photographs if they give "the jury an 'appreciation of the nature and circumstances of the crimes'." *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 26, quoting *State v. Evans*, 63 Ohio St.3d 231, 251, 586 N.E.2d 1042 (1992).

**{¶39}** We have reviewed the autopsy photographs. We find such illustrated and supported Dr. Sterbenz's testimony regarding the child's injuries and cause of death. The photographs also aided in explaining why Appellant's claim the injuries were the result of an accident was not plausible. The photographs were, therefore, useful to the jury. Although five of the photographs were used more than one time in the PowerPoint presentation, those photographs were offered for different purposes and to highlight areas different from the areas highlighted on the photographs as previously presented. While the autopsy photographs are disturbing as they depict injuries to a deceased infant, we do not find these photographs are so gruesome as to prejudice Appellant. Accordingly, we find the probative value of these photographs outweighed any prejudice to Appellant and the trial court did not abuse its discretion in admitting them.

C. PowerPoint Presentation

**{¶40}** Appellant also challenges the trial court's admission of Dr. Sterbenz's PowerPoint presentation on two grounds. First, Appellant argues he was prejudiced by the manner in which Dr. Sterbenz's testified. Appellant explains the medical examiner prepared and delivered "an elaborate presentation, as if teaching a class", which relieved the state from having to prepare a line of questioning for the witness. Additionally, Appellant asserts certain non-photographic slides served to prejudice the jury.

**{¶41}** With respect to the manner in which the medical examiner testified, our review of the record reveals the prosecutor did, in fact, engage in a proper direct examination of Dr. Sterbenz. We find, although Dr. Sterbenz provided extensive answers, his answers detailed the child's injuries, explained how the child would have sustained the injuries, and detailed the manner and cause of her death; therefore, were appropriate.

{¶42} With respect to the graphics within the PowerPoint presentation, Appellant specifically takes issue with slide 16, clipart of a ball bouncing on a floor.  Although slide 16 was not admitted into evidence, the slide was published and included with the print version entire PowerPoint provided to the jury during deliberations.  Appellant maintains slide 16 was prejudicial as it "leads one to picture a small child's head bouncing against the floor repeatedly." Brief of Appellant at 13.  Appellant submits slide 16 provided little to no probative value, but only served to inflame the passions of the jury.  We find, although slide 16 was erroneously provided to the jury, it did not prejudice Appellant.  Dr. Sterbenz testified the child had been subjected to more than a dozen blunt impact injuries to the front and back of her head.  The graphic in slide 16 provided a relatable visual of a blunt force impact; therefore, was demonstrative of how the injuries occurred.  Assuming, arguendo, it was error to send slide 16 to the jury, in light of the totality of the evidence, its admission was harmless.

{¶43} Appellant also takes issue with slide 47, medical illustrations showing the difference between a spiral fracture and a clean fracture. One illustration depicts adult hands twisting the leg of a child. Appellant submits, upon viewing the illustration, the jury "[u]ndoubtedly" imagined Appellant twisting the child's "arms and legs, even though there was no evidence that limb fractures were part of the fatal event."  Brief of Appellant at 12. The trial court determined the illustrations aided Dr. Sterbenz during his testimony and allowed the jury to better understand the medical examiner's testimony. We find no abuse of discretion on the part of the trial court in doing so.

{¶44} Contrary to the position asserted by Appellant that the graphics and illustrations were not relevant and of no probative value, we find the physical evidence

revealed by the photographs and the expert opinion of Dr. Sterbenz, demonstrated and supported by the slides, rebutted and refuted Appellant's claim the child was injured as the result of a fall down stairs. The PowerPoint presentation assisted the jury while Dr. Sterbenz discussed his findings, diagnoses, and opinions. Accordingly, pursuant to the guidelines set forth in Ohio Evid. R. 401, we find the graphics and illustrations were clearly relevant evidence, and further find such did not confuse the issue or mislead the jury.

**{¶45}** Prior to trial, the trial court carefully examined each slide and entertained arguments by the prosecution and defense regarding the PowerPoint presentation. The trial court agreed with Appellant regarding three of the graphics, including slide 16, finding they were unnecessary and instructed the state to remove or revise the graphics from the specific slides.

**{¶46}** For the foregoing reasons, we find the trial court did not abuse its discretion in admitting the autopsy photographs and the PowerPoint presentation into evidence.

**{¶47}** Appellant's second assignment of error is overruled.

{¶48}  The judgment of the Stark County Court of Common Pleas is affirmed.


By: Hoffman, J.

Wise, John, P.J.  and

Gwin, J. concur